IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIAN JOHN, SR., *et al.*,<br><br>Petitioners,<br><br>v.<br><br>AGUSTIN GARCIA, *et al.*,<br><br>Respondents.<br>_____/ | No. C 16-02368 WHA<br><br>**ORDER GRANTING<br>MOTION TO DISMISS** |

## INTRODUCTION

Respondents move for the third time to dismiss this petition for writ of habeas corpus pursuant to the Indian Civil Rights Act. The motion is **GRANTED**.

## STATEMENT

The parties herein belong to the Elem Indian Colony of Pomo Indians (the "Tribe"). A general council comprising all qualified voting members governs the Tribe and delegates various powers to a biennially-elected executive committee. Following a disputed election in November 2014, two factions — petitioners and respondents — each purported to be the Tribe's duly-elected executive committee. Respondents managed to establish themselves as such and remain in power as the current executive committee, though petitioners continued to contest the results of the 2014 election.

On March 28, 2016, respondents issued an "Order of Disenrollment" to petitioners and other members of the Tribe. The disenrollment order accused petitioners of "violating the laws of Elem" and included a list of offenses. It stated, "If you are found guilty by the General

Council of these offenses against the Tribe, you may be punished by . . . DISENROLLMENT — loss of membership." Recipients of the disenrollment order could submit a written answer within 35 days admitting or denying each accusation (Dkt. No. 30-1 at 12).

The disenrollment order issued pursuant to Tribal ordinance number GCORD08412, "Ordinance Establishing the Tribal Sanctions Of Disenfranchisement, Banishment, Revenue Forfeiture, and Disenrollment And the Process for Imposing Them," and pursuant to powers delegated to the executive committee by general council resolution number GC80412. In relevant part, the sanctions ordinance defined "disenrollment" as (Dkt. No. 30-1 at 4):

> The penalty by which a member of Elem is permanently removed from the membership roll of Elem for all purposes. . . . Disenrollment may only be imposed by the General Council pursuant to this Ordinance, and only if the member . . . [i]s expressly found by the General Council to warrant Banishment pursuant to this Ordinance, but the General Council specifically finds that Banishment is inadequate to protect the members, resources, or sovereignty of Elem from the behavior of the accused Tribal member under the specific circumstances of that person's case. Disenrollment of an individual for these reasons shall only be used as a last resort.

The sanctions ordinance defined "banishment" as (*id.* at 3):

> The penalty by which a member of Elem is banished from Elem, after which the banished person may no longer obtain any of the benefits of membership in Elem, attend Elem meetings, or enter, possess, or use for any purpose any property held in trust by the United States for Elem or otherwise belonging to or occupied by Elem. Banishment shall only be imposed pursuant to this Ordinance if the General Council specifically finds that the offenses committed and the injuries caused to Elem and its members are of the worst nature, and that the subject person cannot be rehabilitated.

Shortly after issuance of the disenrollment order, on April 30, 2016, petitioners filed this petition for writ of habeas corpus, alleging denial of due process and equal protection in violation of the Indian Civil Rights Act. Respondents moved to dismiss the original petition. From the start, the parties disagreed on numerous key points of fact, including whether or not petitioners had actually been disenrolled and whether or not they timely answered the disenrollment order. During oral argument on that first motion to dismiss, counsel for petitioners presented evidence that contradicted representations made by counsel for respondents on both fronts (*see* Dkt. No. 28 at 15:11–23:21, 28:5–16).

It also came out during that hearing that on June 2, 2016, respondents had issued a "Disenrollment Notice of Default," which claimed that petitioners' time to answer the disenrollment order had passed. Petitioners and other recipients of the order were thus deemed to be in default and to have admitted the allegations against them. The notice of default specifically stated, "You are therefore found guilty of the offenses against the Tribe charged against you in the Complaint and your punishment for those offenses is . . . **Loss of Membership:** <u>Disenrolled from the Elem Indian Colony as of June 2, 2016</u>" (*e.g.*, Dkt. No. 14-1 at 5 (bold and underline in original)). In light of this contested, apparently unreliable, and still-evolving record, the undersigned judge granted petitioners leave to file an amended petition in lieu of ruling on respondents' first motion to dismiss (Dkt. No. 28 at 28:17–29:15).

Petitioners then filed an amended petition, and respondents again moved to dismiss (Dkt. No. 35). An order after the hearing on respondents' second motion to dismiss explained (Dkt. No. 50):

> Contrary to the plain text of the disenrollment order and notice of default, however, counsel and the current Tribal Chair for respondents represented at the hearing on their motion to dismiss today that not a single petitioner is currently disenrolled. Moreover, counsel and the Tribal Chair represented that the disenrollment order and notice of default are ineffective and, for all intents and purposes, dead letters; that no petitioner needs to do anything, including appear before the general council, in response to either document; and that no disenrollment proceedings are currently underway or pending against any petitioner. In short, respondents have unequivocally conceded away the entire disenrollment issue, and all collateral consequences thereof — including the prospect of permanent banishment that is the crux of this petition — have apparently evaporated.
>
> The Court is thus inclined to dismiss this petition. The volatility of relations between the two sides, however, is such that the potential need for relief in the near future remains a real possibility. This action, moreover, has been plagued by evolving and shifting facts and narratives, and testimony elicited during the hearing today suggests some effects of respondents' now-repudiated actions — such as the denial of medical services to petitioners based on their purported "disenrollment" — continue to reverberate.
>
> Accordingly, this order **DEFERS** ruling on respondents' pending motion to dismiss. A further hearing on this matter is set for **MARCH 16**. In the meantime, petitioners shall issue subpoenas and take depositions as needed to discover evidence, if any, of the practical effects of respondents' disenrollment order and notice of default on petitioners.

3

Before the follow-up hearing could take place, however, proceedings were stayed at the parties' request pending mediation before Judge Nandor Vadas.

During the stay, petitioners submitted a bolus of disorganized materials, including deposition transcripts, exhibits, and various other documents, in a single combined filing titled "Supplemental Materials and Request for Discovery" (Dkt. No. 60). Another order denied the request for discovery, stating (Dkt. No. 65 (italics in original)):

> Statements in passive tense like "Ms. Steele was recently denied use of the Elem PRC Program because she was deemed ineligible" and "Ms. Steele was informed that she was not eligible for the Elem PRC Program" beg key questions like *who* denied her use of the program and informed her that she was ineligible (*see id.* at 5). Even the declaration itself suffers from the same defects, setting forth unhelpful statements like "I was told that these expenses needed to be reimbursed directly by the Tribe" and "I was denied access [to a tribal meeting]" (*see id.* at 99, 101).
>
> It is unfair to the judge to make these non-specific statements, with citations to similarly non-specific declarations buried in a hundred-page-plus combined document, and expect the judge to surmise factual details that should be plainly set forth in petitioners' request. The Court is not convinced at this time that further discovery is warranted. Petitioners' request is therefore **DENIED** without prejudice to their renewing it at a later time. If the request is renewed, however, it should be written in active voice and should clearly set forth complete and accurate citations to supporting evidence.

Petitioners never renewed their request for discovery.

Prior orders extended the stay several times to give the parties every opportunity to resolve their differences in mediation until, with Judge Vadas's retirement approaching, another order finally put an end to the stay and required respondents to renew their motion to dismiss (Dkt. No. 71). Respondents then filed the instant motion (Dkt. No. 74). This third motion to dismiss, like its predecessors, has been fully briefed. The Court also requested and received an amicus brief from the United States on the issue of subject-matter jurisdiction. Both sides have had an opportunity to respond to the amicus brief. In light of the foregoing history, no further hearing is necessary to decide this motion.

**ANALYSIS**

Respondents' renewed motion to dismiss repeats their position that petitioners have not been and will not be disenrolled or banished in the foreseeable future. It appends a letter dated

4

March 31, 2017, from respondent Tribal Chairman Agustin Garcia to petitioner Adrian John, regarding the disenrollment order. The letter states (Dkt. No. 74-1 at 6):

> In the interest of working towards the healing of our internal Tribal difficulties, the Elem Executive Committee has withdrawn that complaint (and all others against Elem members) and has resolved to take no action whatsoever towards disenrolling you or any other Tribal member. No Elem member has been disenrolled and no process is underway to disenroll any member.
>
> We hope to work with all Tribal members to amend our Tribal Constitution by Secretarial Election as soon as possible to ensure that disenrollment is not available as a Tribal punishment as well as making other changes for the benefit of ALL Tribal members.

The evidentiary record otherwise remains substantially unchanged since respondents' second motion to dismiss.

Based on the premise that no petitioner has been disenrolled or banished, or will be disenrolled or banished in the foreseeable future, respondents contend this petition must be dismissed for lack of subject-matter jurisdiction because it remains (1) unripe, (2) barred by tribal sovereign immunity, and (3) "a purely intra-Tribal dispute that should not be heard by this Court" (Dkt. No. 74 at 5). Their main thesis seems to be that petitioners cannot establish subject-matter jurisdiction under the ICRA because they failed to establish the requisite custody or detention for seeking such relief. This order must agree.

The ICRA provides, "The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe." 25 U.S.C. § 1303. Our court of appeals has described two jurisdictional prerequisites for a petition for writ of habeas corpus under Section 1303. *First*, the petitioner must be in custody or detained. *Second*, the petitioner must exhaust tribal remedies before filing a petition. *Jeffredo v. Macarro*, 599 F.3d 913, 918 (9th Cir. 2010). The instant petition fails to satisfy the first jurisdictional prerequisite to show custody or detention.

Invocation of Section 1303 requires "a severe actual or potential restraint on liberty." *Id.* at 919 (citing *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 880 (2d Cir. 1996)). Petitioners' theory is essentially that, according to the sanctions ordinance, banishment is a lesser included penalty of disenrollment. Thus, they reason, they were necessarily banished

from the Tribe by the notice of default informing them of their supposed disenrollment (*e.g.*, Dkt. No. 30 at 8–9). Additionally, petitioners claim they remain "subject to physical removal" at any time because their disenrollment makes them "trespassers" on the Tribe's land. And, disenrollment would exclude petitioners from "culturally significant areas on the Reservation" like roundhouses and burial grounds. These effects, petitioners allege, amount to a "severe restraint" that permits invocation of Section 1303 (*see id.* at 10–14).

*Jeffredo* remains closest to a controlling decision on point. There, an Indian tribe disenrolled several members for failing to prove their lineal descent. The members then brought a petition for writ of habeas corpus under Section 1303, claiming, as petitioners do here, that their disenrollment amounted to unlawful detention. 599 F.3d at 915–17. Our court of appeals rejected the petitioners' argument, noting that, under the tribe's laws, disenrollment was not tantamount to banishment. *Id.* at 916. Moreover, our court of appeals concluded that "denial of access to certain facilities," including the tribe's health clinic and school, did not "pose a severe actual or potential restraint on . . . liberty" given that the petitioners were never arrested, imprisoned, fined, "or otherwise held by the Tribe," nor had they been evicted or "suffered destruction of their property." *Id.* at 919. Furthermore, "potential threat of future eviction is not sufficient to satisfy the detention requirement of [Section] 1303." *Id.* at 920.

Similarly, petitioners' allegations here show no "severe restraint" that would permit invocation of Section 1303. Petitioners repeatedly claim in vague terms that unspecified persons denied them access to facilities or services, precluded them from political or cultural forums in the Tribe, and prevented them from collecting shares of the Tribe's revenue (*see, e.g.*, Dkt. No. 30 ¶¶ 13–25). Under *Jeffredo*, these restrictions do not suffice to trigger Section 1303. *See* 599 F.3d at 919. Petitioners also argue that, pursuant to the sanctions ordinance, disenrollment necessarily entails banishment, which in turn entails eviction. Thus, petitioners reason, they remain under threat of eviction that — despite the lack of any *actual* banishment or eviction — qualifies as a "severe restraint" for Section 1303 purposes (*see* Dkt. No. 30 ¶¶ 26–59, 81–92, Prayer for Relief). But *Jeffredo* specifically rejected the notion that "potential threat of future eviction" suffices to trigger Section 1303. 599 F.3d at 920.

6

It has become clear, moreover, that whatever threat there may have been in the disenrollment order and notice of default has been withdrawn and disavowed over the course of this litigation. Petitioners devote a substantial section of their opposition to the instant motion to flyspecking the authenticity of respondents' letter dated March 31, 2017 (Dkt. No. 76 at 4–8), but this nitpicking misses the point. As petitioners even acknowledge, that letter was only the latest iteration of a recurring theme. The record in this matter has become saturated with respondents' multiple unequivocal representations, including representations made in person before the Court, that no threat of disenrollment or banishment looms over petitioners. Understandably, petitioners may still distrust respondents' intentions, but the fact remains that respondents have, on the record, neutralized any threat that may have been posed to petitioners by the disenrollment order or notice of default. Given that those documents formed the backbone of petitioners' arguments that they have been "detained," even if petitioners had a colorable argument at the outset that either document posed a sufficiently dire threat to invoke Section 1303, they no longer have any such argument at this point.

Petitioners continue to rely on *Poodry* as their best legal authority on point (*see* Dkt. No. 76 at 10–12). In *Poodry*, an Indian tribe disenrolled and permanently banished certain members using orders that read in part, "You are to leave now and never return. . . . YOU MUST LEAVE IMMEDIATELY AND WE WILL WALK WITH YOU TO THE OUTER BORDERS OF OUR TERRITORY." 85 F.3d at 878. After a failed initial attempt to take the petitioners into custody and eject them from the reservation, the respondents in *Poodry* harassed and physically assaulted the banished members and their families, including by stoning them and cutting off their access to electricity and healthcare. The respondents also appealed to state and federal government officials for assistance in removing the banished members from the reservation. *Id.* at 878–79. Under those circumstances, the Second Circuit held that a penalty of permanent banishment could suffice to trigger Section 1303, and indeed did so given those facts. *Id.* at 879–80.

Petitioners have not alleged any facts remotely like those present in *Poodry*. Petitioners have not been removed from their homes or the Tribe's land. They have not been assaulted or

7

1  threatened with eviction efforts involving government officials.  As explained, they have not
2  even been disenrolled or permanently banished (or, at least, any disenrollment or banishment
3  that may have taken place has since been totally withdrawn and disavowed).  Their claim to
4  relief under Section 1303 remains predicated on their own perception that two documents, both
5  now dead letters, rendered them "trespassers," and their insistence that respondents generally
6  cannot be trusted to not "detain" petitioners in the future.  In short, on these facts, *Jeffredo*
7  clearly remains the best authority on point and requires dismissal of the petition.

Petitioners also attempt to rely on *Tavares v. Whitehouse*, 851 F.3d 863 (9th Cir. 2017), a recent decision by our court of appeals, for the proposition that permanent banishment constitutes a "severe restraint" for Section 1303 purposes (*see* Dkt. No. 76 at 13).  *Tavares*, which actually affirmed a dismissal of a petition for writ of habeas corpus that challenged an order temporarily excluding tribe members from tribal land (but not the entire reservation), did not set forth any "bar" like that articulated by petitioners.  *See* 851 F.3d at 868.  Petitioners' theory seems to be that *Tavares* said "[a] temporary exclusion is not tantamount to a detention," *id.* at 877, so by inference, a permanent exclusion — like permanent banishment — must qualify as a "detention" sufficient to trigger Section 1303 (*see* Dkt. No. 76 at 13).  This is a non sequitur.  But even assuming for the sake of argument that petitioners' tortured reading of *Tavares* was accurate, it would not help their cause here because, as explained, petitioners have not been permanently banished or excluded from the Tribe.  Again, *Jeffredo* remains the best authority on point and requires dismissal of the petition.

Petitioners attempt to distinguish *Jeffredo* on the bases that (1) their supposed disenrollment occurred pursuant to a criminal sanctions ordinance, not an enrollment ordinance; (2) the petitioners in *Jeffredo* had more due process than petitioners did here; and (3) here, unlike in *Jeffredo*, disenrollment necessarily entails banishment, which in turn entails the threat of eviction (Dkt. No. 76 at 14–15).  Each of petitioners' arguments turns on a distinction without a difference.  Even *Poodry*, petitioners' best legal authority, recognized that imposition of a criminal sanction is not by itself sufficient to trigger Section 1303. 85 F.3d at 879.  The decision of our court of appeals in *Jeffredo* did not turn on the level of due process afforded to

8

the petitioners there. And, as explained, petitioners here have not shown that they remain under any threat of disenrollment, banishment, or eviction, let alone any threat amounting to a "severe restraint" sufficient to invoke Section 1303.

The true theme of this petition seems to be that petitioners feel their membership in the Tribe remains at risk, essentially because their political rivals remain in power and have, at minimum, expressed some desire to threaten petitioners with exclusion from the Tribe, if not to outright exclude petitioners at some point and under some pretext or another. This order in no way minimizes the seriousness of these political disputes and their impacts on the lives of the Tribe's individual members. No amount of attorney rhetoric, however, can coalesce the general history and atmosphere of hostility and distrust between the Tribe's rival factions into a "severe restraint" such that one faction may petition for writ of habeas corpus under Section 1303.

Since petitioners failed to establish the requisite custody or detention for seeking relief via a petition for writ of habeas corpus under Section 1303, this petition must be dismissed. Petitioners have not requested further leave to amend, and such leave would not be warranted in any event in light of the multiple opportunities already granted for petitioners to cure the deficiencies in their petition, including by taking discovery. Because this order concludes petitioners have not shown a "severe restraint" sufficient to invoke Section 1303, it does not reach the parties' additional arguments, including arguments regarding exhaustion of administrative remedies or sovereign immunity.

## CONCLUSION

For the foregoing reasons, respondents' motion to dismiss is **GRANTED**. This petition is **DISMISSED**. The Clerk shall please **CLOSE THE FILE**.

**IT IS SO ORDERED.**

Dated: March 31, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

9